**People of the State of Illinois, Plaintiff-Appellee, v. Frank J. Bruno, Defendant-Appellant.**

**Gen. No. 53,274.**

First District, Fourth Division.

May 14, 1969.

Blacher, Buckun & Nellis, of Chicago (William J. Nellis, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane, Theodore Shapero, and Patrick T. Driscoll, Jr., Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE DRUCKER delivered the opinion of the court.

Defendant appeals from a conviction, after a bench trial, of the offenses of rape and deviate sexual assault. Judgments were entered and the defendant was sentenced to three to eight years in the Illinois State Penitentiary on each offense, the sentences to run concurrently. Defendant raises two points on appeal: (1) he was not proven guilty beyond a reasonable doubt; and (2) the sentence was manifestly excessive.

EVIDENCE

Testimony of complaining witness:

She is divorced and living with her three children, ages six, five and three and one-half. She occupies a three bedroom house with two bedrooms upstairs and one downstairs. Her parents' home is about twelve feet away and her other neighbor about thirty feet. She is five feet four or five inches in height and weighs about 135 pounds and has no physical infirmity or disability. On May 5, 1967, she went to sleep at 10:00 p. m. in the downstairs bedroom with her three year old daughter. At about one o'clock the doorbell rang and she got up, put on a floor length robe over her nightgown and answered the door. The defendant was at the door and he said, "It's Frank. Let me inside." She had met him once or twice before and remembered him vaguely. She said, "What's the matter?" and he replied, "I don't know." He put his hand to his head like there was something the matter with him, like he was in trouble.

She met defendant a few months prior to the incident when he drove her and her date, Jack Soper, to a party. She had met the defendant once before with his wife. Defendant had never been a guest in her home. On May 6th she did not remember his last name although she did know his first name.

She let defendant into the house. He sat on the couch and she sat in another chair. A conversation took place. Defendant asked if she had a gun. The telephone rang in the dining room and it was Jim Wallace on the phone. She asked Jim if he knew the defendant but she could not remember defendant's last name so she asked him what it was. He said his name was "Fred. Fred Keno." She told Jim and asked him to come over. Defendant then asked if she would make him some coffee; when she refused he said that he thought he had better go, and he asked her to walk him to the door. She refused.

221

Defendant got up and she got up, and then he walked towards her and grabbed her and threw her down on the couch, and a lamp fell over. He grabbed her around the shoulders. He threw her down on the couch and started choking her. She does not know if she was screaming or crying or what. He said, "If you shut up I'll leave you alone." So she shut up, and then he pushed her onto the floor. He then pushed up her nightgown and he forced his way to have intercourse with her.

He then let her get up. She was crying or screaming and he said, "Just be quiet and I'll leave. I'll leave you alone." And he said, "I'm sorry, I'm sorry."

He went toward the door and then he turned around and came at her again and pushed her down on the floor. They struggled for awhile and then he got down on top of her. He was moaning and groaning and he forced her to commit an act of oral copulation.

Then the doorbell rang and defendant got up and told her to shut up. He took her into the hallway. She had told him previous to this that James Wallace was going to come over; and she kept telling him. She said, "Leave, Jim's going to come over." He said, "If that guy comes through the door I'll kill him."

She is not sure when she told him about Jim Wallace coming over. It might have been right after the telephone conversation or it might have been when he came back at her again. At the time he left her son had fallen out of bed upstairs, so she ran upstairs and put him in bed. She came downstairs and looked out the window and saw defendant walk right to a car that was two doors down. She then called the police and called her father who lives right next door. The police arrived in five minutes. She spoke with Officer Toomey. She described what happened and described the defendant. She told the officer that defendant had told her that his name was Fred but that she believed that it was Frank. The police took her to the hospital.

In court she identified a picture of defendant and noted that he was wearing a brace in the picture. She had felt the brace when she was battling with him on the floor. She identified the nightgown that she was wearing the night of the occurrence and noted that it was ripped along the top. It was not ripped before defendant came into her home on the night in question.

The lamp was knocked over as she was thrown to the couch. Neither the bulb nor the filament broke. The lamp was off during the first act of intercourse. It must have gone off when it fell over, but the bulb was not broken. She is not really sure how the lamp went off; in fact she is not sure if the lamp was off. She does not remember if defendant turned off the lamp. She told the Grand Jury that the lamp was knocked over. After her testimony to the Grand Jury was read to her she remembered stating that defendant shut the lamp off.

There was an intercom system between her house and her father's but it never worked well. She doesn't believe that it was working on the night in question. She never left it on all the time. It was a system where one party had to buzz the other to talk. She did not scream or cry to bring her mother to her house.

Defendant was choking her hard but it left no marks on her; neither were there bruises from the fighting, wrestling and choking.

During the act of intercourse she did not scratch him nor did she scream; she was frightened. Defendant never threatened her children.

During the act of oral copulation she attempted to bite him and he stopped and started choking her. She stated:

> He was moaning, he was groaning, he was like he was out of his mind. He was making enough noise that the kids could wake up. If they came down and saw that, wouldn't that have been nice!

223

Testimony of James Wallace, called by the State:

On May 6, 1967, he was employed by Republic Steel in Chicago and he worked on the 4:00 p. m. to midnight shift. After work that day he stopped off and had a couple of beers and then called the complaining witness at about 1:00 a. m. After the conversation he finished his beer and proceeded to her house.

He rang the bell but the house remained dark. He rang the bell a few times and he knocked on the door; then he knocked on the window which is immediately to the left of the door. He knocked on the window a few times but there was no response. He then proceeded to the back door and knocked there. Through the back window everything looked dark. When he looked in through various windows of the house he did not see any lights. He did not hear any screams nor any crying. He did not hear anything. He then drove his car to a tavern two blocks away and called complainant's home. The line was busy. He called again after five or six minutes and the complainant's father answered. After that, he finished his beer and went past the house but did not stop.

Testimony of Edward Toomey, called by the State:

He is a police officer. He arrived at the house of the complaining witness at about 1:55 a. m. She was crying and upset when he arrived and they could not get much information from her until she was given an opportunity to sit down for awhile.

He got a description of the offender. She did not know the first name very clearly; she said either Fred or Frank, and she did not know the last name. He arrested the defendant in front of defendant's house at about 4:30 a. m. of the same morning.

He inventoried the nightgown and defendant's clothes. He obtained the nightgown from the hospital. It was inspected by detectives from the Homicide Unit. They are the ones who brought her to the hospital and back.

224

Testimony of Frank J. Bruno, defendant:

He is separated from his wife. He has children whom he supports. He was employed at Motor Express, Inc., as a truck driver.

Prior to May 6, 1967, he knew the complaining witness. He had known her for a few years but not really well. He saw her last about two and one-half months before the day in question at a party. He saw her when she was with Jack Soper on the night of the party. At that time he went into her house with Soper and stayed for about twenty-five minutes.

He has never gone out with her socially but he had had conversations with her prior to the day in question. On the day in question previous to 1:00 a. m. he had been in the M. & B. Club for a couple of hours. He had been drinking. He left the lounge and drove, alone, to her house. He had not intended to go there; he was heading for a lounge in that neighborhood, Poinsettia. He parked in front of her house, walked up and rang the bell once. He stayed in front for a few seconds and was about to leave when a light came on and she came to the door. She looked out of the window and started opening the inner door and said, "Oh, hi, Frank." She asked him in and he went; she closed the door behind him. He did not force his way into the house, he was invited. He sat on the couch and she sat down next to him on the couch. She was wearing a housecoat and a nightgown. He had on a suit jacket, dress pants, dress shirt and a back brace. Her housecoat had buttons and was not buttoned; she was sort of holding it closed. She never buttoned the housecoat. He had no weapon of any kind.

They conversed for about ten minutes and then the phone rang. She answered the phone in an adjoining room and returned in about five minutes and asked if he knew James Wallace. She said that it had been Wallace on the phone and that he was going to stop over later. Defendant said that he had only stopped over to say

hello and that he had better be going. They both stood up only a matter of inches apart. He grabbed her by the waist and leaned down to kiss her; he kissed her on the lips and she kissed him back on the lips. She did not say anything.

The both sort of slid down on the couch. He was on his knees on the couch and reached over and shut off the light; the lamp did not fall to the floor. She did not say anything; she made no noise nor did she make any motions. He reached down and pulled up her night-gown and housecoat and had intercourse with her. She did not attempt to push him away, she did not scream or cry; she responded to his love making. She did not bite, kick or scratch. He did not have to wrestle with her.

Just as they completed the act of intercourse there was a knock at the door; they were about six feet from the door. They then proceeded to the kitchen on defendant's suggestion. He did not drag her or force her into the kitchen, nor did she scream or cry. He kissed her once in the kitchen; she made no attempt to fight him off, nor did she ask him to leave, nor did she scream or cry.

As they walked back into the living room he said that he thought that he better go and she agreed. They were next to the couch and he kissed her again, and they slid down onto the floor and an act of oral copulation took place. At first she wanted to have intercourse in the normal manner but after he said, "Oh, come on" she consented to the oral copulation.

After they got up her kissed her. He said that he would call her later in the week and she said that would be fine. He never threatened to harm her children.

At no time and in no manner did she resist his advances. He knew that she was divorced and that she was living alone with her children. He never told her that he

was in any trouble. He had not seen nor spoken to her in a month and a half, since the party. When he left she was not crying and she was not upset.

He decided to stop over because on a previous occasion when he had seen her she had asked him to stop over. At the party a month and a half before during conversation she had said, "Stop over any time."

Testimony of Joseph Price, called by the defense:

He is a mircroanalyst in the Scientific Crime Detection Laboratory of the Police Department. He examined the nightgown of the complaining witness and submitted a written report of the examination. His examination revealed no damage to the nightgown.

OPINION

Defendant first argues that he was not proven guilty of rape beyond a reasonable doubt. The crime charged is defined in the Criminal Code, Ill Rev Stats 1965, c 38, § 11-1:

> (a) A male person of the age of 14 years and upwards who has sexual intercourse with a female, not his wife, by force and against her will, commits rape.

It is not disputed that there was an act of sexual intercourse between the defendant and the complaining witness; the question is whether the act was proven beyond a reasonable doubt to be forcible and without consent.

In People v. Faulisi, 25 Ill2d 457, 185 NE2d 211, the complainant admitted defendant into her home at 3:00 a. m. while clad only in pajamas. She testified that she was forced into a bedroom and struggled to fight off the defendant; that she had bruises (which was uncorroborated); that she had a one-quarter inch cut near one

eye; that she was sent to the hospital. The doctor did not testify. The evidence also showed that there was one house 20 feet away and other houses nearby and that the downstairs apartment was also occupied. Defendant admitted the intercourse but denied using force. The court first stated generally at page 461:

> When the charge is forcible rape, the fact that the act of intercourse was performed forcibly and against the will of the complaining witness is a necessary element of the crime which must be proved beyond a reasonable doubt. The degree of force exerted by the defendant and the amount of resistance on the part of the complaining witness are matters that depend upon the facts of the particular case. Thus we have held that resistance is not necessary under circumstances where resistance would be futile and would endanger the life of the female as where the assailant is armed with a deadly weapon, and that proof of physical force is unnecessary if the prosecuting witness was paralyzed by fear or overcome by superior strength of her attacker. (People v. Ardelean, 368 Ill 274.) It is, however, fundamental that in order to prove the charge of forcible rape there must be evidence to show that the act was committed by force and against the will of the female, and if she has use of her faculties and physical powers, the evidence must show such resistance as will demonstrate that the act was against her will.

The court in reversing the conviction then stated at page 463:

> We are constrained to say, after a careful review of the entire record, that the testimony of the complaining witness is not sufficiently convincing to

228

lead to an abiding conviction of the defendant's guilt. Under such circumstances her evidence should be corroborated by some other testimony, fact or circumstance. (People v. Hiller, 7 Ill2d 465.) Here the only corroboration concerned the ¼-inch cut under her eye, and the fact that she telephoned her husband and told him she had been raped. In our opinion, however, more striking than these corroborating factors is the complete absence from the record of other corroborating evidence which might reasonably have been supposed to be available had the complaining witness been raped, for example, the failure to produce medical testimony as to the injuries to the complaining witness despite the fact that the record shows that there was a medical examination, her failure to cry for help, and the absence of any physical evidence of any struggle sufficient to overpower physically or overcome the will of the complaining witness.

In the instant case there was no cut or other manifestation of physical injury. There was corroboration as in Faulisi of police notification. However, this evidence of complaint, although competent to corroborate her testimony, is not proof of the commission of the act. People v. Scott, 407 Ill 301, 306, 95 NE2d 315. The evidence showed that complainant voluntarily let the witness into her house at one o'clock in the morning. She claimed that she did so because he seemed to be in trouble; but this is disputed by defendant and it does not appear that she asked him to leave immediately after discovering that he was not. She stated that she was thrown down onto the couch, that the lamp next to the couch was knocked over, that she was either screaming or crying, and that she was choked in order to make her be quiet. On cross-examination she admitted having

testified before the Grand Jury that defendant had turned off the lamp. Defendant testified at trial that he turned the lamp off, and it does not appear that the lamp or the bulb in it was damaged. If it is true that the complaining witness was screaming or crying, it is reasonable to suppose that her children, her parents or the neighbor would have heard her outcries. And if complaining witness was harshly choked, it is incredible that there were no marks of any kind on her throat nor any bruises on her body. Although she was taken to the hospital, no medical evidence was introduced. Furthermore, the crime lab specialist who examined the nightgown shortly after the occurrence testified that there was no damage at all to the gown. This evidence strongly implies that there was no resistance.

There also does not appear to be any attempt to summon help although the complaining witness had several excellent opportunities to do so. She claims that she began to fear some harm when defendant told her that his name was Fred Keno when she knew that his first name was Frank. At the time that she inquired the defendant's name she was talking to James Wallace on the telephone which was in an adjoining room and yet, despite being scared, she did not manifest any fear to Wallace. She did ask him to come over to her house, but there was no apparent urgency in the request, and Wallace took the time to finish his drink before leaving for her home. Further, the whole question of the conversation concerning the defendant's name is suspect because she testified that the defendant identified himself as "Frank" before she admitted him into her home. Although she testified that she didn't believe the intercom system to her father's house was working, she did not attempt to use it or to telephone for help from the dining room while defendant sat in the living room. Her best opportunity to summon help came when James

Wallace knocked at her front door, but she chose to remain silent. It is not reasonable that defendant's alleged threat to kill Wallace would be sufficient to deter a woman who had just been raped from summoning aid.

■ All of these elements taken together raise a reasonable doubt of the defendant's guilt of the crime of rape and we conclude that the evidence was insufficient to establish beyond a reasonable doubt that the act was forcible and against the will of the complaining witness.

■ Defendant was also convicted of the crime of deviate sexual assault. It is defined in the Criminal Code, Ill Rev Stats 1965, c 38, § 11–3 (a):

> (a) Any person of the age of 14 years and upwards who, by force or threat of force, compels any other person to perform or submit to any act of deviate sexual conduct commits deviate sexual assault.

The Committee Comments to that section state:

> The phrase used in section 11–3 is intended to state generally the equivalent of the force requirement in rape. (See People v. DeFrates, 395 Ill 439, 70 NE2d 591 (1947). This case involved a conviction for rape and the crime against nature growing out of a single transaction. The same conduct would likewise be covered by the rape (§ 11–1) and deviate sexual assault (§ 11–3) provisions of the Code.) The Committee felt it unwise and unnecessary to attempt to spell out in precise detail the nature of the threats that are included within the "threat of force" phrase employed. It was deemed safer to provide a general guide which can be refined by the courts to cover particular fact situations. Obviously, all possible fact variations could not be covered in the draft.

Under the circumstances of the instant case and for the reasons hereinabove stated we conclude that defendant was not proved guilty of a sexual deviate assault. Since we are reversing the convictions, it is not necessary for us to consider the excessiveness of the sentences.

The judgments of the Circuit Court are reversed.

Reversed.

ENGLISH and McNAMARA, JJ., concur.