THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* THOMAS P. WALSH, Defendant-Appellant.

First District (2nd Division)    No. 78-1169

Opinion filed January 29, 1980.

Ralph Ruebner and Steven Clark, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Myra J. Brown, and Bruce W. Lester, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE PERLIN delivered the opinion of the court:

Defendant, Thomas P. Walsh, was arrested and charged with two counts of aggravated kidnapping and one count of deviate sexual assault. After a jury trial, defendant was found guilty as charged. The court entered judgment on each verdict and sentenced defendant to two

concurrent extended terms of 60 years on the aggravated kidnapping convictions but failed to sentence defendant on the deviate sexual assault conviction. Defendant appeals.

The following issues are presented for review: (1) whether defendant was proved guilty of aggravated kidnapping and deviate sexual assault beyond a reasonable doubt; (2) whether the prosecutor's argument was improper and exceeded the bounds of fair comment on the evidence; (3) whether defendant was denied a fair trial because the jury may have seen him in handcuffs; and (4) whether the cause should be remanded to the trial court for sentencing on the deviate sexual assault conviction and for proper sentencing on the aggravated kidnapping convictions.

For reasons hereinafter set forth, we affirm the convictions and remand in part for further proceedings not inconsistent with this opinion.

The following testimony was adduced at trial:[1]

George Connors, father of the victim, Christine (Tina) Connors, testified that on the evening of September 28, 1977, at approximately 11 p.m. he received a telephone call from his former wife inquiring as to Tina's whereabouts. After speaking with Tina's mother, Mr. Connors searched for his daughter in a number of places, including her place of employment, but was unsuccessful in his attempts to find her. Mr. Connors notified the police of Tina's disappearance at approximately 10 a.m. on September 29, 1977. That evening he was informed by police that Tina's automobile had been discovered at a laundromat on 171st Street in Tinley Park. Later that same evening Mr. Connors received a telephone call from Tina's boss summoning him to the restaurant where Tina worked. When he arrived, Mr. Connors observed that his daughter was in a "very nervous state" with her hair in disarray and her clothes wrinkled. Tina ran to her father, threw her arms around him and cried, "Oh, Daddy, Daddy he hurt me so bad." Mr. Connors further testified that Tina "had never been missing" prior to this incident.

Christine Connors testified that she was 18 years of age and lived with her mother in Orland Park at both the time of trial and during September 1977. On September 28, 1977, at approximately 1 p.m. Ms. Connors drove to the Country Lane Laundromat on 171st Street in Tinley Park and parked her automobile in the parking lot near the entrance of the laundromat. No one else was present in the laundromat when she arrived. Approximately one-half hour later defendant entered the laundromat, without any laundry, looked around and then departed. As Ms. Connors took the first load of laundry out to her automobile, she noticed defendant sitting in an automobile in the parking lot. When she

---

[1] The multitude of contradictory testimony and defendant's contention that he was not proved guilty beyond a reasonable doubt suggest a necessity for detailed summarization of the testimony of the witnesses.

returned to the laundromat to finish her laundry, defendant again entered the laundromat and appeared to be looking at the bulletin board. Ms. Connors finished her wash, went outside to her automobile and placed a full laundry basket in the trunk of her automobile. As she walked to the door of her automobile, she noticed defendant leaving the laundromat.

Just as Ms. Connors was about to close her automobile door, defendant walked over to her automobile and, brandishing a gun, told her to "move over." Defendant cautioned her not to scream because he would "blow [her] head off." Defendant then started Ms. Connors' automobile and began to drive it out of the parking lot when it suddenly stalled. . Defendant once again warned Ms. Connors not to scream because he had a gun. Defendant grabbed Ms. Connors by the arm, led her to a light aqua colored Chevrolet Bel Air, opened the door, shoved her into the automobile and drove from the parking lot. As he was driving, defendant again advised Ms. Connors to remain quiet. Defendant informed her that he planned to steal her car because he needed money. Defendant further explained that he needed money because "they don't give ex-cons very good jobs." Defendant also informed Ms. Connors that "he [had been] in jail for ten years for killing two people." Defendant stopped his automobile near a farm field and tied Ms. Connors' hands behind her back with a white silk rope. Defendant pulled Ms. Connors from the car and locked her in the trunk. Defendant again cautioned her, "just keep quiet, remember I have a gun, don't make any noises while you are in there." While defendant was putting Ms. Connors in the trunk, she noticed an orange and yellow plastic toy truck, a small red wagon and some tools were inside the trunk.

Defendant drove for approximately two hours with Ms. Connors inside the trunk. He then stopped, opened the trunk and placed Ms. Connors' laundry basket full of clothes next to her in the trunk. He immediately locked the trunk and began driving. After driving for approximately another hour, defendant removed Ms. Connors from the trunk. It was dusk, but Ms. Connors observed that they were at a motel on 159th Street in Markham across the street from the Hub Restaurant. Defendant led Ms. Connors to either room number 20 or 21 in the motel and instructed her to lie on the bed. When Ms. Connors began to cry and shake, defendant placed his hand over her mouth and holding a knife to her, warned her "that if it was necessary he would use the knife because he had killed people before and he [knew] how to use a weapon." Defendant further cautioned "that if [she] started to scream he would shoot [her] with a gun because nobody would think it was anything, they would just think it was a truck backfiring, so he could shoot [her] easily and nobody would know." Defendant then pushed Ms. Connors on the bed and struck her when she began to cry again. While Ms. Connors'

hands were tied defendant attempted to insert his penis into Ms. Connors' anus but was unable to penetrate.

Defendant then showered. When he finished, he untied Ms. Connors' hands and ordered her to shower because "if he got caught it would be used as evidence against him." After showering, Ms. Connors dressed and was advised by defendant that they would stay in the room until dark. Approximately an hour and a half later, defendant once again tied Ms. Connors' hands behind her back, led her out of the motel room and again locked her in the trunk of his car.

Defendant then drove for approximately an hour. When the automobile stopped and defendant opened the trunk, Ms. Connors and defendant were alone inside a garage. Defendant removed Ms. Connors from the trunk and informed her that they were at the newspaper agency where he worked. A few minutes later defendant heard a noise outside the garage. Defendant cautioned Ms. Connors that if she "started screaming or if [she] didn't stay put that he would use the gun because he had done it before and he [knew] how." She was then ordered to hide behind a garbage bin a few feet away while defendant investigated the noise.

When the noise ceased, defendant instructed Ms. Connors to come out from behind the bin and stand next to him. Defendant then pulled her to him and began touching her "all over her body." When Ms. Connors began to cry and pull away, defendant struck Ms. Connors twice with his fist on her jaw. Defendant once again warned Ms. Connors not to make any noise. Defendant then advised Ms. Connors that he would do one of three things with her—kill her, keep her or let her go. When defendant heard Ms. Connors praying, he began choking her, asking, "Do you still believe in God?" Ms. Connors replied, "yes" and defendant stopped choking her.

Defendant once again locked Ms. Connors in the trunk of his automobile and drove for "an hour or two." Ms. Connors heard defendant get out of the automobile and walk away. She "made noises" and attempted to kick open the trunk. However, a few minutes later defendant returned.

After approximately 45 minutes of driving, defendant removed Ms. Connors from the trunk and placed her inside a black van. Defendant instructed her to sit between the two seats in the van. Defendant again drove, eventually returning to the news agency. He then removed Ms. Connors from the van, placed her in the front seat of his car, locking the passenger door.

Defendant drove back to the Highway Motel, warning her not to make any noise. Defendant led Ms. Connors to the same room as before. He then tied her hands and legs to the bed and pulled her pants down.

Defendant informed Ms. Connors that he was going next door and that he would hear her if she made any noise.

Defendant returned after a short while, untied Ms. Connors' hands and feet and ordered her to remove her clothes. Ms. Connors refused, and defendant hit her cautioning her that he would use the gun if she refused. Defendant removed all of Ms. Connors' clothes except her socks, completely undressed himself and pushed her face down on the bed. Defendant smeared VO-5 in Ms. Connors' anus and penetrated her anus with his penis. Ms. Connors told him to stop because she "had to go to the bathroom." Ms. Connors sat in the bathroom until defendant ordered her to shower and dress. Ms. Connors then asked defendant if he would release her. Defendant answered her that he would think about it overnight and decide in the morning.

Defendant ordered Ms. Connors to lie on the bed next to him. During the night Ms. Connors tried to edge off the bed several times, but each time defendant awoke. At 6:00 a.m. defendant tied Ms. Connors' hands in front of her, put her sweater over her hands and walked her to the car. Defendant put Ms. Connors in the trunk and drove all day with her in the trunk.

That evening at approximately 9 p.m. defendant removed Ms. Connors from the trunk, placed her in the front seat of the car, locking the passenger door. Ms. Connors loosened the ropes and defendant told her to take them off. While defendant was driving, he informed Ms. Connors that he thought he was "going to let her go." A short time later a police officer in a squad car signaled defendant to the side of the road. While the officer was still in the squad car, defendant cautioned Ms. Connors that if she tried to escape or if she said anything, he would shoot her. Defendant then hurried out of his automobile and met the police officer behind defendant's automobile. A few minutes later the police officer departed and defendant returned to his automobile. Defendant told Ms. Connors that he needed a fuse for his tail light. He also told Ms. Connors that she was "lucky" that she had not said anything or attempted to escape because she would have been hurt.

Defendant stopped at a gas station to repair the tail light. He then drove to 183rd Street and Oak Park. Defendant informed Ms. Connors that he would let her go but said that she could not have her purse or the laundry basket because "his fingerprints were on them and could be used against him if they were found." Defendant then let Ms. Connors out of the automobile, cautioning her not to tell anyone or he would kill her.

Ms. Connors ran from defendant's automobile to Figaro's Restaurant, carrying the contents from her purse and the laundry basket in a bedspread. She ran inside the restaurant and asked some waitresses for help. A few minutes later her boss arrived and drove her back to the

Alexandrian Restaurant, her place of employment, where her parents met her.

Ms. Connors was subsequently taken to Silver Cross Hospital where she was examined by a doctor. She was then taken to her father's house where Tinley Park policemen questioned her. Ms. Connors viewed some photographs and identified defendant as the man who had abducted and assaulted her. Two weeks later Ms. Connors identified defendant in a lineup at the Markham police station.

Officer Charles Montgomery, a Tinley Park police officer, testified that he was assigned to the Christine Connors case at 11 p.m. on September 29, 1977. He witnessed Ms. Connors identify a photograph of defendant from an array of photographs shown to her that evening. He also witnessed Ms. Connors identify defendant in a lineup conducted on October 13, 1977, at the Markham police station. Officer Montgomery also observed Cook County evidence technician Chuck Pearson examine defendant's car and remove hair particles from the trunk.

Janet Grandys, a waitress at Figaro's Restaurant, testified that at approximately 9:20 p.m. on September 29, 1977, Christine Connors walked into the restaurant and asked for help, explaining that she had just been released from her kidnapper. Ms. Connors' hair was in disarray, her clothing wrinkled and "she just smelled something terrible." Ms. Connors was carrying a bedspread containing other items. Ms. Connors asked Ms. Grandys to call her place of employment which would contact her parents. Ms. Connors said that her parents would then take her to the police. While Ms. Connors was waiting for her boss to arrive, she kept rubbing her wrists and neck and continually looked to see if anyone was behind her. Ms. Connors was afraid to go to the bathroom alone and requested one of the other waitresses to stand outside the bathroom door while she was inside.

Ruth Relli, owner of the Highway Motel, testified that a registration card signed by defendant shows that on September 28, 1977, he was assigned room 21 in the Highway Motel.

Investigator Charles Pearson, an evidence technician employed by the Cook County Sheriff's police, testified that on October 4, 1977, he searched defendant's automobile and recovered hair fibers from the trunk, which he sealed in an evidence envelope.

Therese Garcia, a nurse employed by Silver Cross Hospital, testified that at approximately 3 a.m. on September 30, 1977, she removed five hair samples from the head of Christine Connors and sealed them in containers.

Clara Vogt, Detective Roger Barton, Officer Thomas Hayes, Jean Roberts, Detective Charles Montgomery, Officer Kenneth Gates, Officer James Janda and Al Kulovitz all testified to the chain of custody of the

hair fibers found in defendant's car and the hair samples taken from Ms. Connors' head.

Eric Lawrence, a criminalistics specialist for the Illinois Department of Law Enforcement, testified that he had examined and compared the hairs found in the trunk of defendant's car, and the hair samples taken from Christine Connors' head. The comparisons established that the hairs taken from the trunk of defendant's car were microscopically indistinguishable from the hair samples taken from Ms. Connors' head. Mr. Lawrence testified that the rectal swab taken from Christine Connors did not include seminal material.

Leroy Winans, a lifelong friend of defendant, testified on behalf of defendant. He testified that at approximately 6:30 p.m. on September 28, 1977, defendant stopped by Winans' house for approximately 15 minutes. Winans spoke with defendant while both defendant and a girl sat in defendant's automobile. Defense counsel subsequently informed Winans that the girl was Christine Connors. Although Winans recalled that the girl was calm and did not have her hands tied, he did not remember what the girl was wearing. Winans "thought it strange" that his good friend had been arrested for kidnapping Ms. Connors, although he did not suggest to the police or the State's Attorney that defendant had been framed.

James Allcox, another lifelong friend of defendant, testified at trial that at approximately 7 p.m. on September 28, 1977, he saw defendant at the Marathon Gas Station, Allcox's place of employment. Ms. Connors was seated in the front seat of defendant's automobile and did not appear to be nervous or frightened. Mr. Allcox worked with defendant and "Christie" to repair the tail light of defendant's automobile. Mr. Allcox saw defendant and "Christie" the next evening at the gas station where they once again worked to repair the tail light from approximately 7 until 9 p.m. While Mr. Allcox was repairing the tail light, he noticed children's toys in the trunk.

Mr. Allcox admitted that defendant's father advised him of Ms. Connors' hair color and style.

Defendant, Thomas P. Walsh, testified that at approximately 2:30 p.m. on September 28, 1977, he stopped to purchase liquor and cigarettes at the Tinley Park Grocery on 171st Street. Christine Connors approached him in the parking lot[2] and informed him that she was having trouble with her automobile. After unsuccessful attempts to start the automobile, defendant asked Ms. Connors if she would like to go to lunch and then go to his place of employment to get jumper cables. Ms. Connors agreed and they went to lunch at Denny's on 159th Street.

---

[2] It appears defendant is referring to the same parking area to which the victim referred in her testimony.

After lunch, while seated in defendant's automobile, Ms. Connors asked defendant if he "smoked pot" or "took pills." She then swallowed a green pill that she had taken from her purse. Defendant and Ms. Connors began "making out." Defendant then asked Ms. Connors to go "bar hopping" that night and she agreed. Ms. Connors did not want to call work that night or the following day because she would "catch hell" from her boss.

Defendant and Ms. Connors drove to the Highway Motel in Markham, where he registered in room 21. Defendant and Ms. Connors then had sexual intercourse. Ms. Connors did not resist defendant, nor did they have anal intercourse. Afterwards they both showered and left the motel.

Defendant and Ms. Connors then drove to Mr. Winans' house where they stayed for half an hour. When they left Winans' house, they proceeded to a Marathon gas station in South Holland because the tail light of defendant's automobile was not functioning properly. Defendant introduced Christine to Jim Allcox. Defendant and Allcox attempted to repair the tail light. Defendant and Ms. Connors drove to the Midlothian News Agency, defendant's place of employment, to get the jumper cables. Defendant drove one of the agency vans to Tinley Park where he started Ms. Connors' automobile. Ms. Connors and defendant locked Ms. Connors' automobile, drove back to Midlothian News Agency to retrieve defendant's automobile.

Defendant and Ms. Connors returned to the Highway Motel. Defendant purchased a six-pack of beer from the lounge next door and they began drinking. Ms. Connors swallowed another pill. They again had sexual intercourse. They both showered and then Ms. Connors fell asleep. While Ms. Connors was sleeping, defendant called his place of employment to report that he was sick and unable to work that evening. However, defendant drove to the news agency and "opened it up." Defendant then went back to the Highway Motel where he slept next to Ms. Connors.

When they awoke at 9:30 a.m. the next morning, Ms. Connors "had a fit," saying that "her mother was going to kill her because she stayed out all night." After eating, they drove to a forest preserve at 175th and Kedzie and discussed Ms. Connors' "problem." Defendant instructed Ms. Connors to go home, but she refused. They then drove to the Midlothian News Agency to obtain defendant's paycheck, which they then cashed.

Defendant and Ms. Connors returned to the forest preserve where they again discussed Ms. Connors' "problem." Ms. Connors suggested that they go to California. Defendant replied that her suggestion was ridiculous. Afterwards defendant failed to stop for a red light and was

stopped by a Dolton police officer. Defendant got out of his car and talked with the police officer who warned defendant about his tail light. The police officer was dressed in uniform and was very tall, about six foot five inches. Defendant purchased some fuses and drove to the Marathon gas station where he, his friend and Ms. Connors repaired the tail light.

Defendant drove back to Tinley Park and informed Ms. Connors that he was taking her home. Ms. Connors retorted no and requested that he stop the automobile. She then attempted to jump out of the automobile while it was still moving. Defendant grabbed her arm. However, when defendant drove around the next corner, Ms. Connors jumped out of the automobile screaming obscenities at him. Defendant testified that he had not seen Ms. Connors since that time. Defendant also testified that he did not have in his possession either a knife or a gun during his encounters with Ms. Connors, and that he did not force Ms. Connors "to do anything."

During cross-examination defendant testified that he was stopped by police twice while Ms. Connors was in the automobile. Defendant was stopped by the Calumet City police on September 29, 1977, and immediately thereafter he was stopped by the Dolton police. After viewing three Dolton police officers, defendant denied being stopped by any of the three. Defendant admitted that prior to surrendering, he removed his children's toys from the trunk of his automobile. Defendant also admitted that he had told police officers that he was in the company of a Lori Peterson on one of the nights of this offense.

The State then elicited, in rebuttal, the testimony of Dave Barger, a police officer with the Dolton police department. Officer Barger testified that he stopped defendant at 7:20 p.m. on September 30, 1977, for driving his automobile without tail lights. After Officer Barger informed defendant of the violation, he shined his flashlight into defendant's automobile and looked inside. No one else was in the vehicle. Officer Barger is five feet 11 inches tall.

The jury found defendant guilty of two counts of aggravated kidnapping and one count of deviate sexual assualt.

## I.

Defendant contends that he was not proved guilty beyond a reasonable doubt because the complainant's testimony was rendered incredible by her failure to attempt an escape or to cry out for help. Defendant argues that the complainant had many opportunities to attempt an escape or to cry out for help, including an occasion when police had stopped defendant's vehicle. The State maintains that the clear and convincing testimony of the complainant corroborated by the other

evidence adduced at trial clearly establishes that defendant was proved guilty of aggravated kidnapping and deviate sexual assault beyond a reasonable doubt.

■■ It is peculiarly the province of the jury to weigh the evidence, judge the credibility of the witness and determine the facts; a reviewing court may not encroach upon that function. That evidence has been conflicting will not justify a reversal of a finding by the trier of fact. (*People v. Reese* (1973), 54 Ill. 2d 51, 294 N.E.2d 288.) "A reviewing court will not set aside a jury's verdict of guilty unless the evidence is so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to cause a reasonable doubt as to the guilt of the accused." *People v. Sumner* (1969), 43 Ill. 2d 228, 232, 252 N.E.2d 534.

■■ ■ As the statute defining deviate sexual assault indicates, a material element of the offense is force or threat of force. The nature of the force or threat of force which must be proved is the same as that for rape. (*People v. Anderson* (1974), 20 Ill. App. 3d 840, 314 N.E.2d 651; *In re Darcy* (1974), 18 Ill. App. 3d 1068, 311 N.E.2d 353; *People v. Bruno* (1969), 110 Ill. App. 2d 219, 249 N.E.2d 252.) In rape cases "[t]here is no definite standard fixing the amount of force required and each case must be considered on its own facts." (*People v. Smith* (1965), 32 Ill. 2d 88, 92, 203 N.E.2d 879.) In determining the degree of resistance required of each victim of deviate sexual assault, each case must be considered on its own facts. (*People v. Bendig* (1968), 91 Ill. App. 2d 337, 235 N.E.2d 284.) Useless or foolhardy resistance is not necessary. (*People v. Green* (1976), 38 Ill. App. 3d 289, 347 N.E.2d 224; *People v. Ware* (1973), 11 Ill. App. 3d 697, 297 N.E.2d 289.) "In weighing the evidence of force, it is proper to consider the disparity in size and strength of the parties and the place and conditions under which the act took place." *People v. Sims* (1972), 5 Ill. App. 3d 727, 729, 283 N.E.2d 906.[3]

The testimony of Christine Connors was clear and convincing. Her story never wavered during direct or cross-examination. The clear and convincing nature of the testimony was not disturbed even though Ms. Connors failed to attempt an escape or cry out for help on several occasions. The facts demonstrate that Ms. Connors was in a clearly disadvantageous position so that resistance would have been not only futile but foolhardy. Ms. Connors' actions do not belie her statements that she was afraid.

---

[3] Defendant cites *People v. DeFrates* (1965), 33 Ill. 2d 190, 210 N.E.2d 467, and *People v. Qualls* (1961), 21 Ill. 2d 252, 171 N.E.2d 612, in support of his position. The court in *DeFrates* at page 195 found that "there is nothing in the evidence which supports the conclusion that the prosecutrix was gripped by a paralyzing fear." *DeFrates* is further distinguishable because no weapon was involved, nor was there corroboration by some other testimony, fact or circumstance. In *Qualls* the court opined at page 257: "We are constrained to say, after a careful reading of the entire record, that the testimony of the prosecuting witness lacks verisimilitude. In such instance the evidence of the prosecutrix should be corroborated by some other testimony, fact or circumstance."

In addition, the testimony of Ms. Connors was corroborated by other evidence presented at trial, including the testimony of both her father and Ms. Grandys, the microscopic hair comparisons, and the immediate reporting of the incident to the police.

Thus we cannot conclude that the evidence is so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to cause a reasonable doubt as to the guilt of defendant.

## II.

Defendant contends that he was denied a fair trial because the prosecutor, during closing argument, remarked that the complaining witness was not lying because she had been "grilled" by the police and the State's Attorney and had been told that if she lied she would "get in trouble with the State's Attorney." Defendant argues that these remarks were not based on facts in evidence and were an attempt to bolster the credibility of the witness by placing the authority of the State's Attorney behind her. The State contends that the comments by the prosecutor were proper because they were invited comments made in response to defense counsel's closing argument and because they were based on evidence introduced at trial or were reasonable inferences deducible therefrom.

During closing argument defense counsel contrasted the testimony of the complaining witness with the testimony of defense witnesses James Allcox and Leroy Winans, commenting that if the defense witnesses lied on the stand they would risk being indicted for perjury:

> "Now at this point, we have Christine Connors' word against the word of Thomas Walsh, Jim Allcox and Leroy Winans. * * * They [Allcox and Winans] took the stand and the prosecutor would like you to feel that because they were his buddies * * * that they lied. If they got on the stand and lied they would be subject to being indicted for perjury. How many friends do you know or how many friends do you have or would you get on the stand and lie for a friend or a relative and risk being indicted for perjury."

The prosecutor responded to defense counsel's argument by commenting on the credibility of the complainant Christine Connors:

> "Something to take into account is a person's interest in a case. Motive for lying. Why Tina is lying * * * Or why he is lying * * * You think he might lie to save his skin. You better believe it. Why did Tina go through all this. You heard her testify. She ran into a restaurant with strangers. She said she told them what happened. She was grilled by the State's Attorney. She was told if she's lying you're going to get in trouble with the State's Attorney."

We note that whether language used by a prosecutor will require reversal depends upon the facts of each case and that where argument of defense counsel invites or provokes a response, defendant cannot

complain that he was prejudiced by the response. For example, in *People v. Kelly* (1975), 25 Ill. App. 3d 753, 324 N.E.2d 82, defense counsel in his final argument emphasized that the witness was a Baptist minister and missionary. Defense counsel then argued: "I can't imagine any Baptist minister or missionary can sit on the witness stand after taking an oath and tell you that a man painted his house on a certain day when in fact it did not happen * * * ." (25 Ill. App. 3d 753, 757.) In response to this argument the prosecutor made the following comments:

> "If there had been a statue of the Blessed Mary in the courtroom when the Reverend testified, she would have put her hands over her ears because there was nothing spewing forth from the witness chair but unmitigated lies.
>
> * * *
>
> I am sorry if the State couldn't bring in a fine, upstanding witness like the Reverend Cox, self-ordained, or ordained by some other Reverend. How unusual that he never finished grammar school— strike that; he never finished high school, but he went on to a university—two colleges, one of divinity that he didn't finish and one of business school; this he never finished. How strange. And this Reverend, he is separated from his wife. How strange.
>
> * * *
>
> * * * if he [defendant] can get somebody to come up and lie for him under the cover of the cloth of God, I will believe him. That's what you are saying [if you find the defendant not guilty]." (25 Ill. App. 3d 753, 756-57.)

The court found that these remarks were in response to the argument of defense counsel.

In the case at bar defense counsel explicitly juxtaposed the credibility of the victim Christine Connors with defense witnesses Allcox and Winans and then proceeded to suggest that Allcox and Winans were telling the truth because "if they got on the stand and lied they would be subject to being indicted for perjury." The prosecutor's statements that Ms. Connors had been "grilled" by the authorities and would "get in trouble" if she lied were in direct response to defense counsel's use of the threat of perjury to support the credibility of his own witnesses.

We agree with the general proposition that the State's Attorney should not lend the weight of his office to support the credibility of the State's witness. Defendant cites *People v. Bitakis* (1972), 8 Ill. App. 3d 103, 289 N.E.2d 256, and *People v. Brown* (1977), 47 Ill. App. 3d 920, 365 N.E.2d 514, as authority for this proposition. In *Brown* the prosecutor, in closing argument, remarked: "And if you decide that [the police officers] lied to you, [*sic*] better loathe Mr. Lindmark [another assistant State's Attorney] and you better loathe me, because we prosecuted it." (47 Ill. App. 3d 920, 930.) The appellate court in *Brown* at page 931 in affirming

Brown's conviction distinguished *Bitakis* as follows: " * * * [W]e find *Bitakis* distinguishable from the [*Brown*] case. In *Bitakis*, the prosecutor 'pledged his personal reputation that a state witness was not a false one.' The assistant State's Attorney here was more restrained. His comment fell short of a blunt pledge to the jury."

Moreover, it is well settled that in closing argument to the jury, a prosecutor may discuss the witnesses and their credibility. In *People v. Oden* (1975), 26 Ill. App. 3d 613, 325 N.E.2d 446, the prosecutor, during his closing argument, stated:

> "The defense in this case says, and even admits, the defendants concede the description fits these men. I think that would establish the case that we have beyond a reasonable doubt. It is inconceivable to me, to the People, this woman would fabricate this type of story, if we are to assume it is a story, as was indicated before. What reason would she possibly have? ·When we call witnesses to the stand to testify, we vouch for their credibility. The People are saying in essence, that person is telling the truth and you should believe her." (26 Ill. App. 3d 613, 617.)

*Oden* contended that this comment was a prejudicial, personal statement as to the credibility of the complaining witness and the prosecutor's personal opinion of defendant's guilt. The appellate court held that "the prosecuting attorney merely commented on the credibility of the complaining witness. No personal comment or highly personal argument appears in the record." 26 Ill. App. 3d 613, 617.

In the case at bar the prosecutor's comments likewise fall short of a blunt pledge of personal reputation or highly personal argument. In addition, these comments were based upon evidence introduced at trial. It is permissible for a prosecutor to comment upon facts and circumstances introduced into evidence at trial and upon legitimate inferences therefrom. The prosecutor's statement that Christine Connors was "grilled" by the authorities is supported in the record by Ms. Connors' testimony on both direct and cross-examination that she was questioned in depth by the police and assistant State's Attorney on a number of occasions. Moreover, the prosecutor's comments on Ms. Connors' credibility are supported by her repeated testimony on cross-examination that the State's Attorney did not tell her what to say but only advised her to tell the truth.

Although these remarks would have been better left unsaid, we do not think the remarks, viewed in their proper perspective, were so prejudicial as to constitute reversible error.

## III.

Defendant contends that he was denied a fair trial because jurors and prospective jurors, while waiting in a bus outside the courthouse, may

have seen defendant, in handcuffs, being transported to the lockup facility across the street from the courthouse. The State maintains that defendant was not denied a fair trial because of this "inadvertent incident."

At the conclusion of a day of jury selection, while waiting in a bus outside the courthouse, the jurors and prospective jurors may have seen defendant, in handcuffs, being transported to lockup facilities across the street from the courthouse. The following day defense counsel made a motion for a mistrial because of this incident. No evidence was introduced to demonstrate how many, if any, jurors or prospective jurors actually saw defendant. In response the State explained that defendants who were in custody had to be transported to the adequate lockup facilities across the street from the courthouse and argued that this inadvertent incident was not grounds for a mistrial. The trial court denied defendant's motion, observing that at all times during which defendant was in the courtroom he was unshackled, dressed in civilian clothes and freshly shaven.

In support of his contention defendant cites *Kennedy v. Cardwell* (6th Cir. 1973), 487 F.2d 101, and *People v. Boose* (1975), 33 Ill. App. 3d 250, 337 N.E.2d 338. We find these cases distinguishable from the instant case. In *Boose* defendant was shackled with a restraining belt around his waist and handcuffed through the shackles on the belt. The laces were removed from his shoes. Defense counsel moved that Boose be unshackled throughout the proceedings before the jury, arguing that the jury would be irrevocably prejudiced against defendant and would be led astray in their deliberations. Defense counsel pointed out that the belt severely limited Boose's movements and directed the court's attention to the presence of special guards in the courtroom. No evidence was offered by the State in opposition to the motion to unshackle defendant. The trial court denied defendant's motion. On appeal, the appellate court held that the trial judge abused his discretion by ordering that Boose appear shackled before the jury. In *Kennedy* defendant was shackled to a uniformed deputy sheriff throughout his jury trial.

Cases involving shackling of a defendant have been divided into three categories. (*Kennedy.*) The first category includes those cases involving a defendant who stands trial in shackles. The second category pertains to an excessive number of guards in the courtroom during the criminal trial. A third group of cases includes those where the defendant was seen in shackles for a short period of time either in the courtroom or somewhere in or around the courthouse by the jury, by one or more jurors or by veniremen. Both *Kennedy* and *Boose* fall within the first category of cases. However, the instant case falls within the third category of cases.

The majority of the third category of cases state that such a brief and fortuitous incident is not prejudicial and requires an affirmative showing

of prejudice by defendant. (See, *e.g.*, *United States v. Leach* (8th Cir. 1970), 429 F.2d 956; *Hardin v. United States* (5th Cir. 1963), 324 F.2d 553; *Blaine v. United States* (D.C. Cir. 1943), 136 F.2d 284.) "The fact that jurors may briefly see a defendant in handcuffs is not so inherently prejudicial as to require a mistrial." *People v. Hyche* (1978), 63 Ill. App. 3d 575, 583, 380 N.E.2d 373, *aff'd* (1979), 77 Ill. 2d 229, 396 N.E.2d 6.

In *People v. Dismuke* (1972), 3 Ill. App. 3d 553, 278 N.E.2d 152, defendant argued that he was prejudiced as a result of the fact that he could have been seen by the jury in a barred detention cell as the jury passed into the courtroom. He argued that the jury would have difficulty applying the presumption of innocence after viewing defendant in a barred detention cell. It appeared that the outer door of the detention cell was inadvertently left ajar. The jury had already been advised of defendant's incarceration by direct and cross-examination of a codefendant. The appellate court held that under these circumstances the error could not be considered sufficiently prejudicial to deprive defendant of a fair trial or to otherwise offend constitutional safeguards.

In the case at bar defendant contends that the State failed to show that such security measures were necessary. Defendant argues that he should not have been transported from one building to another when the jury was present and further that it was not necessary to handcuff him. The State must take security precautions with a defendant in custody, particularly when such defendant is being tried for aggravated kidnapping and deviate sexual assault and has previously been convicted of murder and aggravated battery. To hold under these circumstances that defendant was not a threat to escape or to become violent is to sanction the hollowest of claims.

■■ Moreover, in the case at bar defendant has shown no prejudice. The record fails to disclose how many, if any, jurors actually saw defendant. Any prejudice which may have resulted from the incident was effectively overcome by the trial court's instructions to the jury. Both before and after the challenged incident, the trial court instructed the jury that the defendant is presumed innocent throughout the trial and that formal charges placed against defendant are not to be considered evidence of his guilt. Thus we cannot conclude that the incident was sufficiently prejudicial to deprive defendant of a fair trial or to otherwise offend his constitutional safeguards.

## IV.

On April 14, 1978, defendant was found guilty of two counts of aggravated kidnapping and one count of deviate sexual assault. Judgment was entered on each verdict. On May 19, 1978, the trial judge sentenced defendant to two concurrent extended terms of 60 years for the

aggravated kidnapping convictions but failed to sentence defendant for the deviate sexual assault conviction.[4]

The State contends that the cause should be remanded to the trial court for sentencing because the trial court failed to sentence defendant for deviate sexual assault, a Class X felony.[5] Defendant does not address this issue in his brief.

■■ When an appeal is brought by a defendant, it is proper for the appellate court to remand the cause to the trial court for sentencing where sentence has not been imposed on one of the convictions. (*People v. Scott* (1977), 69 Ill. 2d 85, 370 N.E.2d 540.) The appellate court is empowered by Supreme Court Rule 366(a) (Ill. Rev. Stat. 1977, ch. 110A, par. 366(a)) to remand a cause for the imposition of a sentence upon an incomplete judgment of conviction. (*Scott.*) Further, the appellate court's holding in *People v. Dean* (1978), 61 Ill. App. 3d 612, 378 N.E.2d 248, that a trial court lacks authority to fail to impose any sentence upon a properly entered judgment of conviction, would indicate that this court is required to correct such error. "The effect of the remanding order for the imposition of sentence is to complete the circuit court's order and render the judgment final." (*Scott,* at 89.) Thus we remand the cause to the trial court for sentencing on the deviate sexual assault conviction.

In addition, defendant contends that the cause should be remanded so that the trial court may correctly sentence defendant to an extended term of not more than 30 years for each of the convictions of aggravated kidnapping, a Class 1 felony (Ill. Rev. Stat. 1977, ch. 38, par. 10—2(b)(2)), in conformity with section 5—8—2 of the Unified Code of Corrections (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—8—2). The State concurs with defendant. Section 5—8—2 of the Unified Code of Corrections (Ill. Rev. Stat. (1977), ch. 38, par. 1005—8—2) provides that when factors in aggravation are found to be present, a judge may sentence an offender who has committed a Class 1 felony to an extended term of not more than 30 years. Thus we conclude that the cause should also be remanded to the trial court for proper sentencing on the aggravated kidnapping convictions.

In light of the foregoing, we affirm the convictions of defendant and remand the cause to the circuit court for sentencing not inconsistent with this opinion.

Affirmed and remanded in part.

STAMOS and HARTMAN, JJ., concur.

---

[4] It appears from the record that this was the result of an oversight and not intentional.

[5] Defendant elected pursuant to section 8—2—4(b) of the Unified Code of Corrections (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1008—2—4(b)) to be sentenced under the Class X legislation.